1    Daniel C. Girard (State Bar No. 114826)
     Jonathan K. Levine (State Bar No. 220289)
2    GIRARD GIBBS LLP
     601 California Street, 14th Floor
3    San Francisco, California 94108
4    Telephone:    (415) 981-4800
     Facsimile:    (415) 981-4846
5    Email: jkl@girardgibbs.com
     Email: dcg@girardgibbs.com
6
7    (Additional Counsel on Signature Page)

     Attorneys for Plaintiffs Lewis Booth
     and Stephen Drews
9



10                    **UNITED STATES DISTRICT COURT**
11              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
12

13   LEWIS BOOTH, as Trustee for the Booth Trust     **CV 13 4921**
     dated 11-20-96, and STEPHEN DREWS, on          CASE NO _____
14   behalf of themselves and all others similarly
15   situated,                                      CLASS ACTION

16                          Plaintiffs,             COMPLAINT FOR VIOLATIONS
                                                    OF THE FEDERAL SECURITIES
17          v.                                      LAWS

18   STRATEGIC REALTY TRUST, INC. (f/k/a            JURY TRIAL DEMANDED
19   TNP STRATEGIC RETAIL TRUST, INC.),
     THOMPSON NATIONAL PROPERTIES,
20   LLC, TNP STRATEGIC ADVISOR, LLC,
     TNP SECURITIES, LLC, ANTHONY W.
21   THOMPSON, CHRISTOPHER S. CAMERON,
22   JAMES R. WOLFORD, JACK R. MAURER,
     PHILLIP I. LEVIN, ARTHUR M.
23   FRIEDMAN, JEFFREY S. ROGERS,
24   ROBERT N. RUTH, and PETER K.
     KOMPANIEZ
25
                            Defendants.
26
27
28

                          CLASS ACTION COMPLAINT

1    Plaintiffs Lewis Booth, as Trustee for the Booth Trust dated 11-20-96, and Stephen Drews

2  ("Plaintiffs") bring claims arising under the Securities Act of 1933 ("Securities Act") individually and

3  on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise

4  acquired Strategic Realty Trust, Inc. (f/k/a/ TNP Strategic Retail Trust, Inc.) (the "Company") common

5  shares between September 23, 2010 and February 7, 2013 (the "Offering Period"), in or traceable to

6  the Company's initial public offering ("IPO"), pursuant to a registration statement and post-effective

7  amendments and prospectuses filed with the U.S. Securities and Exchange Commission ("SEC"), set

8  forth herein at ¶¶39-41 (the "Offering Materials"), and were damaged by the circumstances described

9  below.

10    The allegations in this Complaint are made upon Plaintiffs' personal knowledge with regard to

11  their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief

12  is based upon, inter alia, the investigation by the undersigned counsel as to all other matters. Such

13  investigation has included, among other things, review of press releases, media reports, SEC filings,

14  and information contained in actions brought by the Financial Industry Regulatory Authority

15  ("FINRA") against Anthony W. Thompson, TNP Securities, LLC, and others.

16    Based on the material misstatements and omissions alleged in this Complaint, Plaintiffs, on

17  behalf of themselves and all others who purchased the Company's common shares in or traceable to the

18  Offering Materials, allege only strict liability and negligence claims against the Defendants pursuant to

19  Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k(a), 77l(a) and 77o. The Defendants'

20  state of mind is not an element of any of the claims stated herein. Plaintiffs do not allege that any

21  Defendant made misstatements or omissions with fraudulent intent.

22  **I.    NATURE OF ACTION**

23    1.    During the Offering Period, Defendants sold approximately 9 million shares of the

24  Company's common stock to investors at $10.00 per share, pursuant or traceable to the IPO. The

25  Company's shares were not listed and did not trade on a national securities exchange.

26    2.    In or about September 2008, Defendants Anthony W. Thompson ("Thompson") and

27  Thompson National Properties, LLC ("TNP"), an entity that Thompson wholly owned and managed,

28  formed the Company to invest in a portfolio of income-producing real-estate related assets located

1  |  primarily in the Western United States. Throughout the Offering Period, TNP served as the Company's
2  |  "sponsor."

3  |      3.    At the time Thompson and TNP formed the Company, they also formed TNP Strategic
4  |  Retail Advisor, LLC ("TNP Advisors"), which Thompson and TNP wholly-owned. TNP Advisors
5  |  managed the Company's day-to-day operations and was responsible for selection of the Company's real
6  |  estate investments.

7  |      4.    To conduct the IPO and bring the shares public, Thompson and TNP formed TNP
8  |  Securities, LLC ("TNP Securities") to serve as the IPO "deal manager." To attract investor interest and
9  |  promote the IPO, TNP Securities was tasked to use "its best efforts to sell [the Company's] shares of
10 |  common stock."

11 |      5.    Because the Company had no real employees, the Offering Materials informed investors
12 |  that the ability to achieve the Company's investment objectives and to pay distributions depended upon
13 |  the performance of TNP, TNP Advisors and its affiliates, and that adverse changes in their financial
14 |  health could cause the Company's operations to suffer.

15 |      6.    Underscoring the Company's dependence on Thompson and TNP, the Offering
16 |  Materials disclosed that they had guaranteed several of the Company's debt issuances, amounting to
17 |  tens of millions of dollars, and that if TNP suffered any decline in revenues and operating results, the
18 |  Company's results of operations, financial condition and ability to pay shareholder distributions could
19 |  also suffer.

20 |      7.    Because the Company's success depended directly on Thompson's and TNP's financial
21 |  health, it was particularly important that the Company present accurate and complete information about
22 |  their financial condition and operating results. Nevertheless, the Offering Materials materially and
23 |  repeatedly misstated and failed to disclose the true nature of Thompson's and TNP's financial
24 |  condition, or that TNP was operating with a significant loss before and throughout the Offering Period,
25 |  had defaulted on loan obligations, and was de facto insolvent.

26 |      8.    To encourage investor interest, the Offering Materials also highlighted the supposed
27 |  historical experience and performance of earlier real estate programs sponsored or advised by
28 |  Thompson, TNP and its affiliates. However, Defendants failed to disclose that several of these earlier

2

1    real estate programs sponsored and managed by Thompson, TNP and its affiliates had been conducted
2    pursuant to materially misleading offering documents, which culminated in a 2013 FINRA action
3    against Thompson and TNP Securities for misleading investors in those programs, as detailed below.

4        9.    On January 16, 2013, the Company revealed that it had defaulted on a $29 million loan
5    that Thompson personally and unconditionally had guaranteed, but failed to honor. The Company also
6    disclosed that it had defaulted on its $45 million revolving credit facility.

7        10.    And on August 28, 2013, the Company issued a press release announcing that a board-
8    level "Special Committee" had been formed a year earlier (i.e., during the Offering Period) "for the
9    protection of shareholders" after TNP was found to be paying fees to itself that had not been earned;
10   had defaulted on certain of its corporate debt obligations; that it had sustained significant corporate
11   losses; and that its negative net worth had grown to over $40 million. In the wake of this disclosure, the
12   Company severed its relationship with Thompson, TNP, TNP Advisors, and TNP Securities.

13       11.    Plaintiffs seek relief under the Securities Act on behalf of themselves and a Class of
14   similarly situated investors for the enormous damages that they have suffered as a result of the
15   allegations described herein.

16   **II.    JURISDICTION AND VENUE**

17       12.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22
18   of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331. The claims alleged herein arise under
19   Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. In connection
20   with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and
21   instrumentalities of interstate commerce, including, but not limited to, the United States mails and
22   interstate telephone communications.

23       13.    Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. §
24   77v, and 28 U.S.C. § 1391(b) and (c). Many of the acts and transactions that constitute violations of
25   law complained of herein occurred in this District and the Company maintains its headquarters and
26   principal place of business in this District in San Mateo, California.

27

28

III.   **PARTIES**

    A.   **Plaintiffs**

    14.   Plaintiff Lewis Booth, as Trustee for the Booth Trust dated 11-20-96, is a resident of Camarillo, California.  As indicated in the certification attached hereto, Mr. Booth acquired for the Booth Trust the Company's common shares pursuant or traceable to the Offering Materials that contained material misstatements and omissions of fact, and has suffered damages as a result of the circumstances described herein.

    15.   Plaintiff Stephen Drews is a resident of Peoria, Arizona.  As indicated in the certification attached hereto, Mr. Drew acquired the Company's common shares pursuant or traceable to the Offering Materials that contained material misstatements and omissions of fact, and has suffered damages as a result of the circumstances described herein.

    B.   **Defendants**

       **Strategic Realty Trust, Inc.**

    16.   The company is a Maryland corporation with a principal place of business at 400 South El Camino Real, San Mateo, California 94402.  The Company primarily invests in and manages a portfolio of income-producing retail properties, located mostly in the Western United States.

    17.   On November 4, 2008, the Company filed a registration statement on Form S-11 with the SEC (the "Registration Statement") offering up to $1 billion in shares of its common stock, at $10.00 per share, in the IPO.  On August 7, 2009, the SEC declared the Registration Statement effective, and the Company commenced the IPO.  The Company's shares are not traded on a national exchange, but as a public issuer of common stock, the Company is subject to SEC reporting requirements.

    18.   On February 7, 2013, the Company terminated the IPO and ceased offering shares.  As of March 22, 2013, there were 10,969,714 shares of common stock issued pursuant or traceable to the IPO.

    19.   On or about August 23, 2013, the Company changed its name from TNP Strategic Retail Trust, Inc. to Strategic Retail Trust, Inc.

CLASS ACTION COMPLAINT

**Thompson National Properties, LLC**

20.   TNP is a Delaware limited liability company that Defendant Thompson founded in February 2008. TNP's principal place of business is 1900 Main Street, Suite 700, Irvine, California 92614, the same location as TNP's two wholly-owned subsidiaries, TNP Securities and TNP Advisors.

21.   Defendant Thompson is the Chairman and CEO of TNP, which served as the Company's sponsor and was responsible for, among other matters, sponsoring the IPO. According to the Company, the ability to achieve its investment objectives and to pay distributions was dependent upon the performance of TNP.

**TNP Strategic Retail Advisor, LLC**

22.   TNP Advisors is a Delaware limited liability company that Defendant Thompson founded in September 2008. At all times relevant herein, Thomson served as TNP Advisors' CEO.

23.   TNP Advisors is wholly owned by TNP, and indirectly wholly owned by Thompson, and was responsible for managing the Company's day-to-day activities and implementing its investment strategy.

24.   TNP Advisors maintains its principal place of business 1900 Main Street, Suite 700, Irvine, California 92614, the same address as TNP and TNP Securities.

**TNP Securities, LLC**

25.   TNP Securities, a registered broker-dealer and FINRA member, served as the Company's IPO dealer manager, and was tasked to use its best efforts to sell the Company's IPO shares. In or about November 2008, TNP and Thompson formed TNP Securities, which is a wholly owned subsidiary of TNP, and at all relevant times Thompson served as its CEO. TNP is the Managing Member of TNP Securities.

26.   According to the Company, its future success depended upon the ability of TNP Securities to establish and maintain a network of licensed securities broker-dealers and other agents to raise adequate proceeds through the IPO.

27.   TNP Securities acted as an underwriter for the Company's IPO, and was responsible for ensuring the completeness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

1    28.    TNP Securities maintains a principal place of business at 1900 Main Street, Suite 700,

2    Irvine, California 92614, the same address as TNP, and TNP Advisors.

3    **The Individual Defendants**

4    29.    Defendant Anthony W. Thompson served as the Company's Chairman from September

5    2008 until August 9, 2013, and currently serves as a member of the Board of Directors. Thompson also

6    served as CEO from September 2008 until August 29, 2012, when he became Co-CEO, a position he

7    held until August 9, 2013. Thompson acted as the Company's President from February 2012 until

8    August 9, 2013. In addition, Thompson serves as CEO of TNP, TNP Advisors and TNP Securities.

9    Thompson is liable under the Securities Act for the misrepresentations and omissions in the Offering

10   Materials pursuant to the Amended Registration Statements dated February 19, 2010, March 16, 2010,

11   April 13, 2010, June 3, 2010, September 2, 2010, December 1, 2010, April 15, 2011, July 15, 2011,

12   October 18, 2011, January 18, 2012, March 1, 2012, April 10, 2012, July 13, 2012, August 31, 2012,

13   and December 7, 2012, filed with the SEC, which he signed.

14   30.    Defendant Christopher S. Cameron ("Cameron") was the Company's CFO, Treasurer

15   and Secretary, and also served as the Chief Administrative Officer of TNP and the CFO, Treasurer and

16   Secretary of TNP Advisors. Cameron held these positions from July 1, 2010 until March 2011.

17   Cameron is liable under the Securities Act for the misrepresentations and omissions in the Offering

18   Materials pursuant to the Amended Registration Statements dated September 2, 2010 and December 1,

19   2010, filed with the SEC, which he signed.

20   31.    Defendant James R. Wolford ("Wolford") was the Company's CFO, Treasurer and

21   Secretary beginning in March 2011, and also served as the CFO, Treasurer and Secretary of TNP

22   Advisors and the Executive Vice President and CFO of TNP. Wolford is liable under the Securities

23   Act for the misrepresentations and omissions in the Offering Materials pursuant to the Amended

24   Registration Statements dated April 15, 2011, July 15, 2011, October 18, 2011, January 18, 2012,

25   March 1, 2012, April 10, 2012, July 13, 2012, and December 7, 2012, filed with the SEC, which he

26   signed.

27   32.    Defendant Jack R. Maurer ("Maurer") was the Company's President and Vice Chairman

28   from February 2010 until his resignation on February 3, 2012. Maurer also served as the Vice

6

1  Chairman-Partner of TNP. Maurer is liable under the Securities Act for the misrepresentations and
2  omissions in the Offering Materials pursuant to the Amended Registration Statements dated February
3  19, 2010, March 16, 2010, April 13, 2010, June 3, 2010, September 2, 2010, December 1, 2010, April
4  15, 2011, July 15, 2011, October 18, 2011, and January 18, 2012, filed with the SEC, which he signed.

5      33.    Defendant Arthur M. Friedman ("Friedman") was a member of the Company's Board of
6  Directors from February 2010 to April 2011. Friedman also served as the Chairman of the Audit
7  Committee of the Company's Board of Directors. Friedman resigned as a director on April 1, 2011.
8  Friedman is liable under the Securities Act for the misrepresentations and omissions in the Offering
9  Materials pursuant to the Amended Registration Statements dated February 19, 2010, March 16, 2010,
10 April 13, 2010, June 3, 2010, September 2, 2010, and December 1, 2010, filed with the SEC, which he
11 signed.

12     34.    Defendant Jeffrey S. Rogers ("Rogers") was a member of the Company's Board of
13 Directors from February 2010 to June 9, 2011. Rogers was also a member of the Investment
14 Committee of the Company's Board of Directors. Rogers is liable under the Securities Act for the
15 misrepresentations and omissions in the Offering Materials pursuant to the Amended Registration
16 Statements dated February 19, 2010, March 16, 2010, April 13, 2010, June 3, 2010, September 2, 2010,
17 December 1, 2010 and April 15, 2011, filed with the SEC, which he signed.

18     35.    Defendant Robert N. Ruth ("Ruth") was, at all times relevant herein, a member of the
19 Company's Board of Directors, beginning in February 2010. Ruth also served as a member of the Audit
20 Committee of the Company's Board of Directors. Ruth is liable under the Securities Act for the
21 misrepresentations and omissions in the Offering Materials pursuant to the Amended Registration
22 Statements dated February 19, 2010, March 16, 2010, April 13, 2010, June 3, 2010, September 2, 2010,
23 December 1, 2010, and April 15, 2011, filed with the SEC, which he signed.

24     36.    Defendant Phillip I. Levin ("Levin") was, at all times relevant herein, a member of the
25 Company's Board of Directors, beginning in April 2011. Levin also served as the Chairman of the
26 Audit Committee of the Company's Board of Directors. Levin is liable under the Securities Act for the
27 misrepresentations and omissions in the Offering Materials pursuant to the Amended Registration
28 Statements dated April 15, 2011, July 15, 2011, October 18, 2011, January 18, 2012, March 1, 2012,

7

1  April 10, 2012, July 13, 2012, August 31, 2012, and December 7, 2012, filed with the SEC, which he
2  signed.

3      37.     Defendant Peter R. Kompaniez ("Kompaniez") served as a member of the Company's
4  Board of Directors from June 2011 to October 2, 2012.  Kompaniez is liable under the Securities Act
5  for the misrepresentations and omissions in the Offering Materials pursuant to the Amended
6  Registration Statements dated July 15, 2011, October 18, 2011, January 18, 2012, March 1, 2012, April
7  10, 2012, July 13, 2012 and August 31, 2012, filed with the SEC, which he signed.

8      38.     Defendants Thompson, Cameron, Wolford, Maurer, Friedman, Rogers, Ruth, Levin, and
9  Kompaniez are collectively referred to as the "Individual Defendants."

10  **IV.    SUBSTANTIVE ALLEGATIONS**

11      39.     On November 11, 2008, Defendants caused the Company to file the Registration
12  Statement with the SEC.  The shares were offered on a continuous offering basis process pursuant to
13  Rule 415 under the Securities Act.  The Company ceased offering shares of common stock on February
14  7, 2013, after having accepted gross IPO proceeds of approximately $106,054,138.

15      40.     Defendants caused the Company to file with the SEC post-effective amendments to the
16  Registration Statement on September 2, 2010 ("Amendment No. 4"), December 1, 2010 ("Amendment
17  No. 5"), April 15, 2011 ("Amendment No. 6"), July 15, 2011 ("Amendment No. 7"), October 18,
18  2011("Amendment No. 8"), January 18, 2012 ("Amendment No. 9"), April 10, 2012 ("Amendment No.
19  11"), July 13, 2012 ("Amendment No. 13"), and December 7, 2012 ("Amendment No. 14")
20  (collectively, the "Registration Statement Amendments").

21      41.     The sale of the IPO shares also occurred pursuant to prospectuses Defendants caused the
22  Company to file with the SEC on August 7, 2009 (the "2009 Prospectus"); April 13, 2010 (the "2010
23  Prospectus), and April 10, 2012 (the "2012 Prospectus") (collectively, the "Prospectuses").   Each of
24  the Prospectuses expressly incorporated by reference the Company's most recent report on Form 10-K
25  and certain reports on Form 10-Qs and 8-Ks filed with the SEC before the date of the Prospectuses.
26  Additionally, each of the Prospectuses contained the following or materially similar language:

27          We have elected to "incorporate by reference" certain information into this
            prospectus.  By incorporating by reference, we are disclosing important
28          information to you by referring you to documents we have filed separately
            with the SEC.  The information incorporated by reference is deemed to be

8

part of this prospectus, except for information incorporated by reference that is superseded by information contained in this prospectus. You can access documents that are incorporated by reference into this prospectus at our website at www.tnpsrt.com.

**A.   Material Misstatements and Omissions in the Offering Materials Concerning TNP's Substantial Operating Losses, Defaults on Two Outstanding Credit Obligations, and TNP's De Facto Insolvency**

42.   Defendant Thompson stood at the apex of the Company, TNP, TNP Advisors and TNP Securities, serving as the Company's CEO, Chairman of the Board and Chairman of its Investment Committee, while serving simultaneously as CEO of TNP, TNP Advisors and TNP Securities. By virtue of these interlocking leadership and control positions, Thompson exercised broad powers and discretion in the course of running the Company's business.

43.   At Thompson's direction, TNP formed the Company in September 2008, ostensibly to offer investors nationwide the opportunity to participate in investments in the real estate market. TNP contributed $200,000 to the Company's formation and was its sole stockholder prior to the IPO.

44.   The Company repeatedly acknowledged that it relied extensively upon TNP, TNP Securities and TNP Advisors to conduct the IPO, invest the IPO proceeds, identify real estate investment opportunities, obtain financing, manage real estate assets, engage in other real estate transactions, and otherwise conduct and oversee the Company's business functions.

45.   As the IPO dealer manager, TNP Securities provided sales and marketing services to promote the Company's IPO to the investing public. In exchange, TNP Securities received 7% of the gross proceeds from the IPO—all or a portion of which was reallowed to other securities broker-dealers—and a dealer manager fee amounting to 3% of the IPO gross proceeds.

46.   The ability to attract investors and successfully market the Company's IPO rested squarely upon TNP Securities. As each Registration Statement Amendment warned, "If our dealer manager fails to perform, we may not be able to raise adequate proceeds through this offering to implement our investment strategy. If we are unsuccessful in implementing our investment strategy, you could lose all or a part of your investment."

47.   In September 2008, Thompson formed TNP Advisors to serve as the Company's advisor. TNP Advisors manages the Company's day-to-day affairs and conducts its operations.

1  According to each Registration Statement Amendment, TNP Advisors was charged with implementing

2  the Company's real estate investment strategy, and was given substantial discretion in selecting and

3  disposing of real estate investments on the Company's behalf.

4      48.    In exchange for providing advisory services, the Company agreed to pay TNP Advisors:

5  (1) 7% of gross offering proceeds from the sale of IPO shares as "sales commissions"; (2) 3% of gross

6  offering proceeds from the sale of IPO shares as "dealer manager fees"; (3) up to 3% of the gross

7  offering proceeds from the sale of IPO shares as reimbursement for expenses incurred on the

8  Company's behalf; (4) up to 2.5% of the cost of assets acquired for the Company (or the allocable cost

9  of investments acquired in a joint venture) as "acquisition fees"; (5) up to 2.5% of the amount funded

10 by the Company to acquire or originate real estate-related loans as loan "origination fees"; (6) up to

11 one-twelfth of 0.6% of the sum of the aggregate cost of all assets of the Company as monthly "asset

12 management fees"; (7) up to 5.0% of the gross revenues generated by the Compan's properties as

13 monthly "property management and leasing fees"; (8) and "disposition fees" up to 50% of a customary

14 and competitive real estate sales commission, but not to exceed 3.0% of the contract sales price of each

15 property sold.

16     49.    From its inception, and throughout the Offering Period, each Registration Statement

17 Amendment made it abundantly clear that the Company depended upon the financial condition of TNP

18 and its wholly-owned subsidiaries, which Thompson formed to take the Company's shares public.

19     50.    For example, each Registration Statement Amendment states that the Company

20 "depend[s] upon [TNP Advisor] and its affiliates to conduct our operations and this offering. Adverse

21 changes in the financial health of our advisor or its affiliates could cause our operations to suffer."

22     51.    Each Registration Statement Amendment also states that the Company's "success

23 depends to a significant degree upon the continued contributions of certain of the key personnel of

24 Thompson National Properties, our sponsor, including Anthony W. Thompson..." Further, according

25 to each Registration Statement Amendment, the "ability to achieve [the Company's] investment

26 objectives and to pay distributions is dependent upon the performance of our advisor, our sponsor and

27 its affiliates." (Emphasis added.)

28

10

CLASS ACTION COMPLAINT

1    52.    Financial dependence on Thompson, TNP and its wholly owned subsidiaries that

2    advised and ostensibly ran the Company, and served as dealer manager for the IPO, was underscored

3    further in each Registration Statement Amendment, which warned,

4

5              To the extent that any decline in revenues and operating results impacts the
               performance of our advisor, sponsor or its affiliates, ... our results of

6              operations, financial condition and ability to pay distributions to our
               stockholders could also suffer.

7

8    53.    Each Registration Statement Amendment advised further that to the extent TNP's

9    financial condition deteriorates,

10             ...it may adversely impact our advisor's ability to perform its duties to us

11             pursuant to the advisory agreement which could have an adverse effect on
               our operations and cause the value of your investment to decrease.

12             Moreover, such adverse conditions could require a substantial amount of
               time on the part of our advisor and its affiliates, thereby decreasing the

13             amount of time they spend actively managing our investments.

14

15   54.    Unbeknownst to Plaintiff and other Class members, TNP's operating results and

16   financial condition—upon which the Company depended to achieve its investment objectives and pay

17   shareholder distributions—had begun to deteriorate significantly before the Company was formed, and

18   continued to worsen materially over the following months and years.

19   55.    The consequence of TNP's financial collapse and resulting impact on the Company's

20   operations and future prospects were not fully acknowledged publicly by the Company until August 28,

21   2013, when, for the first time, the Company revealed that a "Special Committee" had been formed as

22   far back as August 2012, "for the protection of shareholders" after TNP was found to be paying fees to

23   itself that had not been earned, had defaulted on certain of its corporate debt obligations, and that

24   TNP's significant corporate losses and negative net worth had grown to over $40 million. (Emphasis

25   added.)

26   56.    Despite cautioning investors that the Company was reliant upon the financial success of

27   TNP, TNP Securities and TNP Advisor, and that a decline in their revenues and operating results could

28   negatively impair the Company operating results, financial condition and ability to pay distributions to

11

1   stockholders, the Registration Statement Amendments were materially misleading by omitting any
2   meaningful disclosure concerning TNP's financial crisis that existed before and throughout the
3   Offering Period, information that was material to the Company's investors and should have been
4   disclosed.

5       57.    To attain the Company's investment objectives, the Company issued secured debt to
6   acquire various properties, a significant portion of which Thompson and/or TNP guaranteed. By virtue
7   of having guaranteed debt issuances, dating back to at least November 2009, Thompson's and TNP's
8   inability to make good on the debt guarantees was material information that should have been disclosed
9   to investors. In reality, the guarantee was worthless because neither TNP nor Thompson ever had the
10  financial ability to make good on the purported guarantees.

11      58.    Unbeknownst to Plaintiffs and other Class members, TNP, formed in February 2008,
12  had suffered losses of $444,421 by April 2008. By September 2008, TNP's losses had escalated to
13  more than $4 million. Between just April and September 2008, TNP's equity fell from $8.5 million to
14  $5.3 million—a 36.5% drop in only five months.

15      59.    By November 2008, two of TNP's real estate operations had defaulted on their financial
16  obligations, in an amount approximating $1.3 million, and had received formal collection letters from
17  the entity to whom they owed the past-due amounts.

18      60.    By December 31, 2008, nearly nine months before the Offering Period alleged herein,
19  TNP suffered more than $8.4 million in losses in its first 11 months of operations. 2009 was even
20  worse, with losses of more than $25.6 million, resulting in a negative equity of roughly $13.5 million.

21      61.    As of December 31, 2010, just shortly after the start of the Offering Period, TNP's total
22  equity had dropped to negative $29.1 million as a result of a 2010 annual loss of approximately $23.6
23  million.

24      62.    According to a FINRA disciplinary proceeding filed against Thompson and TNP
25  Securities on July 30, 2013, draft audited financials reported that by December 31, 2011, TNP's total
26  equity had declined to negative $41.1 million, following a 2011 annual loss of approximately $17.1
27  million.

28

12

1    63.    Further, throughout 2009 and 2010, TNP and certain of its affiliates were experiencing
2    severe cash flow deficiencies and accruing substantial accounts payable, while simultaneously lacking
3    sufficient cash or cash equivalents to satisfy creditors in a timely manner.

4    64.    Rather than disclose the severity of TNP's rapidly deteriorating financial condition, or
5    that two of TNP's real estate operations had defaulted on their obligations, the Registration Statement
6    Amendments stated only in the most general terms that TNP had sustained losses. This statement,
7    however, was materially misleading by failing to disclose information concerning the magnitude of
8    TNP's existing (and mounting) losses before and throughout the Offering Period, the extent of TNP's
9    cash flow shortfall, and that two of TNP's real estate operations had defaulted on their financial
10   obligations, culminating in TNP's de facto insolvency. This information was material to investors,
11   particularly given the Company's stated reliance on the financial wherewithal of TNP and related
12   affiliates.

13   65.    Ultimately, TNP's financial crisis and de facto insolvency resulted in the Company
14   defaulting on millions of dollars of loan obligations that were supposedly guaranteed by Thompson but
15   not honored, formation of the Special Committee in August 2012 and termination of Thompson and
16   TNP Advisors.

17   **B.    Material Misstatements and Omissions in the Offering Materials Concerning**
18   **Performance of Other TNP-Sponsored Programs**

19   66.    To promote investor interest in the IPO, each Registration Statement Amendment touted
20   TNP's real estate expertise and capabilities, and provided "Prior Performance Summaries" and "Prior
21   Performance Tables" setting forth the supposed performance of other real estate related programs that
22   Thompson, TNP and affiliated entities were sponsoring.

23   67.    For example, Amendment No. 4 states that TNP had, directly or indirectly, sponsored
24   five privately-offered real estate programs as of December 31, 2009, raising more than $56.2 million
25   from approximately 602 investors, including over $19.3 million from a "2008 Participating Notes
26   Program, LLC" (the "2008 Notes") that TNP created on December 9, 2008.

27   68.    Amendment No. 6 states that TNP had, directly or indirectly, sponsored twelve privately
28   offered programs as of December 31, 2010, raising over $112.8 million from approximately 1,331

13

1  investors, including more than $26.1 million from the 2008 Notes and nearly $21.6 million through
2  "TNP 12% Notes Program, LLC" (the "12% Notes") that TNP created in 2010. Amendment No. 6 also
3  describes how the 2008 Notes and 12% Notes (together, the "Note Programs") generated revenue
4  exceeding $4.9 million and $2.3 million, respectively, in 2010.

5  69.  Amendment No. 11 states that TNP had, directly or indirectly, sponsored fifteen
6  privately offered programs as of December 31, 2011, and raised over $147.1 million from
7  approximately 1,560 investors, including more than $47 million raised in connection with the Note
8  Programs.  Amendment No. 11 also describes how the Note Programs generated revenue in excess of
9  $8.2 million in 2011.

10  70.  Unbeknownst to Plaintiff and the other Class members, the performance of the Note
11  Programs described in each Registration Statement Amendment was pure fiction.

12  71.  According to FINRA, in an action brought against Thompson and TNP Securities on
13  July 30, 2013, TNP issued the Note Programs pursuant private placement memoranda that contained
14  material misstatements and omitted material information that should have been disclosed to those
15  investing in the Note Programs.  Because performance of the Note Programs was driven by materially
16  misleading information and material omissions, the "Prior Performance Summaries" and "Prior
17  Performance Tables" set forth in the Offering Materials were materially misleading and did not
18  accurately reflect TNP's true real estate expertise and capabilities or its ability to raise investor funds.

19  72.  According to FINRA, the private placement memoranda for the Note Programs, which
20  Thompson participated in drafting, failed to disclose the increasing likelihood that TNP would not be
21  able to meet the proffered guaranties of principal and interest, and failed to provide prospective
22  investors with sufficient material information regarding the financial performance and condition of
23  TNP or the Note Programs to be able to assess risks that the Notes would default and TNP would
24  abandon its "guaranty."

25  73.  The Registration Statement Amendments boasted about the performance of the Note
26  Programs to encourage investor interest in the IPO, and to comfort investors with information regarding
27  the prior performance of TNP's privately sponsored real estate programs, but nevertheless omitted

28

1  material information concerning the true poor performance of the Note Programs or that they were sold
2  pursuant to materially misleading offering documents.

3       ### C.    The Truth is Revealed and the Company Replaces Thompson

4       74.    On January 16, 2013, the Company filed a supplemental prospectus with the SEC
5  ("Prospectus Supplement No. 12"), revealing that it may not be in compliance with certain provisions
6  of its credit facility and a \$29 million loan it obtained that was guaranteed by Thompson (the "DOF
7  Loan"), which together represented a total indebtedness of approximately \$67.2 million. Prospectus
8  Supplement No. 12 also disclosed that:

> [The Company has] received a notice of default on the DOF Loan dated
> January 14, 2013 with regard to two Events of Default as defined under
> the Loan Agreement. Lender on the DOF Loan is requesting payment of a
> missed deposit into the rollover account, two mandatory principal
> payments and default interest in the aggregate of \$1,280,515.75 by 5:00
> p.m. Friday January 18, 2013. Lender on the DOF Loan may, in its sole
> discretion, accelerate the entire amount of the DOF Loan. We are actively
> negotiating forbearance agreements with these lenders and pursuing
> appropriate cure provisions.    If we are unsuccessful in negotiating
> forbearance agreements or are unable to cure any defaults, certain of our
> properties may be foreclosed on and subsequently sold at values that are
> less than the full value of the properties to us. Such sales would adversely
> affect us and the value of your investment. Even if we are successful in
> negotiating forbearance agreements, such agreements may require
> accelerated or increased loan payments, either of which could adversely
> affect our liquidity.

20      75.    Prospectus Supplement No. 12 also disclosed that as a result of the loan defaults and
21  liquidity issues, the Company intended to move to quarterly distributions (as opposed to monthly) for
22  2013, and that given the defaults, "investors in this offering should not assume that we will resume
23  paying dividends in the short term or at all."

24      76.    Prospectus Supplement No. 12 stated that because of the loan defaults, the Company has
25  suspended its share redemption program, "including with respect to redemptions upon death and
26  disability. We will revisit our capacity to resume share redemptions after resolving our loan issues and
27  transitioning to a new advisor… Investors in this offering should not assume that we will resume share
28  redemptions in the short term or at all."

77.     Finally, Prospectus Supplement No. 12 informed investors that:

> On November 9, 2012, our board of directors determined an estimated value per share of our common stock of $10.60 as of November 9, 2012. The board of directors believes that the subsequent events discussed above may have an impact on the estimated value per share.  As a result, stockholders should not rely on the estimated value per share as being an accurate measure of the current value of our shares of common stock or in making an investment decision.

78.     On April 8, 2013, the Company issued a press release disclosing its efforts to terminate TNP Advisors and appoint a new advisor, and to replace Thompson as CEO.  According to the release, the Company also sought to "correct inaccurate statements contained in a recent letter issued to our shareholders by our current co-CEO and chairman of the board [i.e., Thomson]."

79.     The release confirmed the following:

> …the Lahaina Gateway acquisition and the related [DOF] loan were not in the best interest of our company, especially given our current advisor's known difficulties and the fact that the termination or insolvency of our advisor triggers a default under the loan.  Unfortunately, our advisor misled the board of directors with respect to the [DOF] loan and the Lahaina Gateway acquisition.  For these and other reasons, we are entitled to terminate our advisor for cause.  We have not done so only on account of [DOF's] refusal to consent to such termination on commercially reasonable terms.

80.     On April 18, 2013, the Company filed a report with the SEC on Form 8-K announcing that the Company had dismissed McGladrey LLP ("McGladrey") as the Company's independent registered certified public accounting firm.

81.     On July 17, 2013, the Company issued a press release announcing, among other matters, that TNP Advisors had allowed the Company's unrestricted cash reserves to fall below the $4 million floor mandated in the advisory agreement, as amended.  As of March 31, 2013, unrestricted cash had fallen to just $1.1 million and outstanding accounts payable and accrued expenses exceeded $5 million.

82.     On July 30, 2013, FINRA's Department of Enforcement filed an action against Thompson and TNP Securities in connection with the Note Programs (referenced in the Offering Materials) alleging, among other things, misrepresentations and material omissions, violations of

16

1 Sections 17(a)(2) and 17(a)(3) of the Securities Act, failure to supervise offerings of private placement

2 securities, and the failure to appear and failure to respond timely to FINRA's written request for

3 information pursuant to FINRA Rule 8210.

4      83.      On August 12, 2013, the Company issued a press release announcing that it had

5 "severed" its relationship with TNP Advisors, appointed a new CEO to replace Thompson, and planned

6 to change its name to Strategic Realty Trust, Inc.

7      84.      The release also stated that in order to resolve its obligations under the $29 million DOF

8 Loan, the Company had conveyed title to the Lahaina Center to the lender. And, it further explained

9 that:

> The Lahaina loan contained a number of provisions that potentially exposed the Company to substantial risk and constrained its ability to make certain strategic decisions. Unfortunately the Company's former advisor, Thompson, misled the Board of Directors with respect to Lahaina loan and acquisition.

* * *

> Given that the FINRA report suggests that Thompson is possibly insolvent and a Thompson bankruptcy would trigger a loan default and yield maintenance charges, the Company was at real risk of a recourse deficiency judgment of possibly $10 million to $12 million. The bankruptcy process could have taken many months and perhaps years, and meanwhile the Company would have been unable to operate in a normal fashion.

20      85.      On August 28, 2013, the Company issued a press release disclosing that the Board of

21 Directors had formed a Special Committee in August of 2012 "for the protection of shareholders after

22 [TNP] was found to be paying fees to itself that had not been earned; [TNP] defaulted on certain of

23 their corporate debt obligations; [and TNP's] significant corporate losses and negative net worth grew

24 to over $40 million."

25      86.      The release also revealed that:

> The Company has been working for months trying to get complete shareholder records transferred to an independent third party transfer agent, but Thompson has refused to cooperate in those efforts. Thompson owns or controls the current transfer agent, and continues to demand and collect fees and reimbursements while refusing to turn over shareholder

17

records, which are the property of the Company, not Thompson. Having failed to convince Thompson to turn over the Company's property, the Company had no choice but to file suit against Thompson in an effort to obtain those records. In response to the lawsuit, Thompson furnished a partial list of the required information; however it was just a fraction of the data needed by the new transfer agent to fulfill its duties.

## V.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

87.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements pleaded in this Complaint. The specific statements pleaded herein were not "forward looking statements" when made. To the extent there were any forward-looking statements, there was no meaningful cautionary statement identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of one of the Defendants who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of undisclosed material adverse facts that rendered such "cautionary" disclosures false and misleading.

## VI.    CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

88.    Plaintiffs bring this as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure individually and on behalf of all persons and entities who purchased or otherwise acquired the common stock of the Company during the Offering Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their respective current or former officers, directors, immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest.

89.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to Plaintiffs and can only be ascertained through appropriate discovery, Plaintiffs reasonably believe that there are thousands of members of the Class. Record owners and other members of the Class may be identified by records maintained by Defendants and their transfer agents, and may be notified of the pendency of the action by mail, the internet, or publication using the form of notice similar to that customarily used in securities class actions.

90.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' violations of the Securities Act.

91.     Plaintiffs will fairly and adequately represent the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

92.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. These common questions of law and fact include:

        a. whether Defendants violated the Securities Act as alleged herein;

        b. whether the Offering Materials contained misstatements or omissions of material fact; and

        c. the proper measure of damages.

93.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to obtain individual redress. There will be no difficulty in the management of this action as a class action.

19

## VII.   CAUSES OF ACTION

# COUNT I

### Violations of Section 11 of the Securities Act
### Against the Company

94.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

95.   This Count is asserted against the Company for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and all members of the Class, who purchased or otherwise acquired the Company's common stock during the Offering Period pursuant or traceable to the materially untrue and misleading Offering Materials, and were damaged thereby.

96.   This claim is not based on and does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

97.   The Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

98.   The Company was the issuer of the Offering, and is strictly liable under Section 11 for the materially untrue statements and omissions in the Offering Materials for the Offering of the Company's common stock during the Offering Period.

99.   Plaintiffs and the members of the Class purchased or acquired the Company's common stock pursuant or traceable to the Registration Statement (as amended) during the Offering Period.

100.   At the time they purchased or acquired the Company's common stock, Plaintiffs and the members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Registration Statement (as amended) and incorporated Offering Materials.

101.   The value of the Company's common stock declined substantially subsequent to the consummation of the Offering, and Plaintiffs and the other members of the Class have sustained damages.

102. Less than one year elapsed between the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time this Complaint was filed asserting claims arising out of the falsity of the Offering Materials. Less than three years elapsed between the time that the securities at issue in this Complaint were bona fide offered to the public during the Offering Period and the time that this Complaint was filed asserting claims arising out of the falsity of the Offering Materials for such securities.

103. By reason of the foregoing, the Company is liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired the Company's common stock during the Offering Period pursuant to or traceable to the Offering Materials.

## COUNT II

### Violations of Section 11 of the Securities Act
### Against the Individual Defendants

104. Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

105. This Count is asserted against the Individual Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and all members of the Class, who purchased or otherwise acquired the Company's common stock during the Offering Period in or traceable to the materially untrue and misleading Offering Materials, and were damaged thereby.

106. This claim is not based on and does not sound in fraud. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

107. The Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

108. Each Individual Defendant named in this Count is liable in connection with the Offerings (a) made at a time when the Defendant was a director of the Company, or (b) made pursuant to the Registration Statement (as amended) that the Defendant signed.

1    109.    Each of the Individual Defendants is unable to establish an affirmative defense based on
2  a reasonable and diligent investigation of the statements contained in Offering Materials.    The
3  Individual Defendants did not make a reasonable investigation or possess reasonable grounds to believe
4  that those statements were true and that there were no omissions of any material fact.  Accordingly,
5  they acted negligently and are liable to Plaintiffs and the other members of the Class.

6    110.    Plaintiffs and the Class purchased or acquired the Company's common stock issued
7  pursuant or traceable to the Offering Materials.

8    111.    At the time they purchased or acquired the Company's common stock, Plaintiffs and the
9  members of the Class did not know, nor in the exercise of reasonable diligence could they have known,
10  of the untrue statements of material fact or omissions of material facts in the Offering Materials.

11    112.    The value of the Company's common stock declined substantially subsequent to the
12  consummation of the Offering, and Plaintiffs and the other members of the Class have sustained
13  damages.

14    113.    Less than one year elapsed between the time Plaintiffs discovered or reasonably could
15  have discovered the facts upon which this Complaint is based and the time this Complaint was filed
16  asserting claims arising out of the falsity of the Offering Materials.  Less than three years elapsed
17  between the time that the securities at issue in this Complaint was bona fide offered to the public during
18  the Offering Period and the time that this Complaint was filed asserting claims arising out of the falsity
19  of the Offering Materials for such securities.

20    114.    By reason of the foregoing, the Individual Defendants are liable for violations of Section
21  11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise
22  acquired the Company's common stock during the Offering Period pursuant to or traceable to the
23  Offering Materials.

## COUNT III

### For Violations of Section 12(a)(2) of the Securities Act
### Against TNP Securities, LLC

27    115.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set
28  forth herein.

116.   This Count is asserted against TNP Securities for having promoted and sold the Company's common stock issued in the Offering pursuant to the Offering Materials, which contained untrue statements of material facts and material omissions as alleged herein.

117.   This claim does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

118.   TNP Securities acted as the dealer manager for the IPO and directly solicited the purchase of the Company's common stock by Plaintiffs and other members of the Class by means of the Offering Materials, and financially benefitted thereby.  The acts included but are not limited to providing certain sales, promotional and marketing services to the Company in connection with the distribution of the shares of common stock offered pursuant to the Prospectus and Prospectus Supplements, and offering shares of the Company's common stock to investors on a best efforts basis.

119.   According to the Offering Materials, the success of the IPO and correspondingly the Company's ability to implement its business strategy was dependent upon the ability of TNP Securities to establish and maintain a network of licensed securities broker-dealers and other agents, and that if TNP Securities failed to perform, the Company would not have raised adequate proceeds through the Offering to implement its investment strategy.

120.   In connection with the Offering, TNP used the means and instrumentalities of interstate commerce and the U.S. mails.

121.   TNP Securities is unable to establish an affirmative defense based upon a reasonable or diligent investigation of the statements contained in the Offering Materials.  TNP Securities did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained therein and incorporated by reference in the Offering Materials during the Offering Period were true and that there were no omissions of any material fact.

122.   Plaintiffs and other members of the Class purchased or otherwise acquired the Company's common stock issued in the IPO pursuant to the materially inaccurate Offering Materials and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

1    123.    The value of the Company's common stock declined substantially subsequent to the

2    consummation of the Offering, and Plaintiffs and the other members of the Class have sustained

3    damages.

4    124.    Less than one year elapsed between the time Plaintiffs discovered or reasonably could

5    have discovered the facts upon which this Complaint is based and the time this Complaint was filed

6    asserting claims arising out of the falsity of the Offering Materials. Less than three years elapsed

7    between the time that the securities at issue in this Complaint were bona fide offered to the public

8    during the Offering Period and the time that this Complaint was filed asserting claims arising out of the

9    falsity of the Offering Materials for such securities.

10    125.    By reason of the foregoing, TNP Securities is liable under Section 12(a)(2) of the

11    Securities Act to Plaintiffs and other members of the Class who purchased the Company's common

12    stock in the Offering. Plaintiffs and other members of the Class have the right to rescind and recover

13    the consideration paid for the Company's common stock on which they have suffered damages. In

14    addition, Plaintiffs and the members of the Class who have sold and suffered damages on their

15    purchases of the Company's commons stock that they originally purchased through the Offering are

16    entitled to rescissory damages.

## COUNT IV

### For Violations of Section 15 of the Securities Act
### Against Thompson, Cameron and Wolford

20    126.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set

21    forth herein.

22    127.    This Count is asserted against Individual Defendants Thompson, Cameron, and Wolford

23    for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other

24    members of the Class who have asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act,

25    as set forth above.

26    128.    This claim does not sound in fraud. For purposes of asserting this claim under the

27    Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are

28    not elements of a Section 12(a)(2) claim.

24
CLASS ACTION COMPLAINT

1    129.   Defendants Thompson, as the Company's CEO and Chairman of the Board, and Cameron
2    and Wolford, as the Company's CFO during the Offering Period, were each controlling persons of the
3    Company within the meaning of Section 15 of the Securities Act during their respective periods of
4    employment at the times of the Offerings. Because of their positions of control and authority as senior
5    officers of the Company and their control of the contents of the Company's financial statements and
6    SEC disclosures, Thompson, Cameron and Wolford were able to, and did, control the contents of the
7    Offering Materials during their respective periods of employment, which contained materially untrue or
8    misleading information and omitted material facts.

9    130.   By reason of the foregoing, Defendants Thompson, Cameron and Wolford are liable
10   under Section 15 of the Securities Act to Plaintiffs and the other members of the Class who purchased or
11   otherwise acquired the Company's common stock pursuant or traceable to the Offering Materials, and
12   who were damaged thereby.

13                                         **COUNT V**

14                   **For Violations of Section 15 of the Securities Act**
                             **Against TNP and TNP Advisors**
15

16   131.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set
17   forth herein.

18   132.   This Count is asserted against TNP and TNP Advisor for violations of Section 15 of the
19   Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who have
20   asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above.

21   133.   This claim does not sound in fraud. For purposes of asserting this claim under the
22   Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are
23   not elements of a Section 15 claim.

24   134.   At all relevant times, TNP was, by virtue of serving as the Company's sponsor and its
25   actual control of the Company's activities, a controlling person of the Company within the meaning of
26   Section 15 of the Securities Act. TNP had the power and influence, and exercised that power and
27   influence, to cause the Company to engage in the acts and violations of law complained of herein,
28   including the power and influence to control (a) the Company's participation as an issuer in the

1 Offerings, (b) the Company's role in the preparation and review of the Registration Statement
2 Amendments and other Offering Materials, and (c) the Company's solicitation, offer and sale of the
3 Company's common stock.

4 135. At all relevant times, TNP Advisors was, by virtue of running the Company's day-to-day
5 operations, identifying real estate investment opportunities, obtaining financing, managing real estate
6 assets, engaging in real estate transactions, and otherwise conducting and overseeing the Company's
7 business functions, a controlling person of the Company within the meaning of Section 15 of the
8 Securities Act. TNP Advisors had the power to influence and control (a) the Company's participation as
9 an issuer in the Offerings, (b) the Company's role in the preparation and review of the Registration
10 Statement Amendments and other Offering Materials.

11 136. By reason of the foregoing, Defendants TNP and TNP Advisors are liable under Section
12 15 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise
13 acquired the common stock issued by the Company or underwritten or sold by TNP Securities, and who
14 were damaged thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b. Awarding all damages and other remedies set forth in the Securities Act in favor of Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

1

## JURY TRIAL DEMANDED

2

Plaintiffs hereby demand a jury trial.

3

4

Dated: October 23, 2013

5

GIRARD GIBBS LLP

6

By: _____

7

Jonathan K. Levine

8

Daniel C. Girard

9

601 California Street, 14th Floor
San Francisco, California 94108

10

Telephone: (415) 981-4800
Facsimile: (415) 981-4846

11

Email: jkl@girardgibbs.com

12

Email: dcg@girardgibbs.com
-and-

13

John A. Kehoe (pro hac vice to be submitted)
711 Third Avenue, 20th Floor

14

New York, New York 10017

15

Telephone: (212) 798-0159
Facsimile: (212) 867-1767

16

Email: jak@girardgibbs.com

17

Peiffer Rosca Abdullah & Carr

18

Joseph C. Peiffer (pro hac vice to be submitted)
201 St. Charles Avenue, Suite 4100

19

New Orleans, Louisiana 70170

20

Telephone: (504) 523-2434
Facsimile: (504) 523-2464

21

Email: jpeiffer@praclawfirm.com
-and-

22

Alan L. Rosca (pro hac vice to be submitted)

23

526 Superior Avenue, Suite 401
Cleveland, Ohio 44114

24

Telephone: (888) 998-0520
Facsimile: (504) 586-5250

25

Email: arosca@praclawfirm.com

26

Counsel for Plaintiffs Lewis Booth and Stephen Drews

27

28

27

CLASS ACTION COMPLAINT

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Lewis Booth, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I have reviewed the complaint against Strategic Retail Trust, formerly known as TNP Strategic Retail Trust, its affiliates, and the officers and directors of Strategic Retail Trust, among others, prepared by Fishman Haygood Phelps Walmsley Willis & Swanson, LLP ("Fishman Haygood") and Girard Gibbs LLP ("Girard Gibbs"), whom I designate as my counsel in this action for all purposes. At this time, I adopt the allegations in the complaint.

2. I did not acquire any TNP Strategic Retail Trust securities at the direction of Fishman Haygood or Girard Gibbs or in order to participate in any private action under the federal securities laws.

3. I am willing to serve as a named plaintiff. I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4. I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5. I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6. I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

7. My purchases and sales of TNP Strategic Retail Trust securities during the relevant time period are listed in Attachment A to this document.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24 day of September, 2013.

Lewis Booth, TTEE, Booth Trust dtd 11-20-96

**STEPHEN DREWS**
**ATTACHMENT A**

| Trade Date | Security | Number of Shares | Price Per Unit | Buy or Sell |
|------------|----------|------------------|----------------|-------------|
| 01/19/2012 | TNP Strategic Retail Trust | 10,500 | 10 | Buy |

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Stephen Drews, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I have reviewed the complaint against Strategic Retail Trust, formerly known as TNP Strategic Retail Trust, its affiliates, and the officers and directors of Strategic Retail Trust, among others, prepared by Fishman Haygood Phelps Walmsley Willis & Swanson, LLP ("Fishman Haygood") and Girard Gibbs LLP ("Girard Gibbs"), whom I designate as my counsel in this action for all purposes. At this time, I adopt the allegations in the complaint.

2. I did not acquire any TNP Strategic Retail Trust securities at the direction of Fishman Haygood or Girard or in order to participate in any private action under the federal securities laws.

3. I am willing to serve as a named plaintiff. I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4. I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5. I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6. I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

7. My purchases and sales of TNP Strategic Retail Trust securities during the relevant time period are listed in Attachment A to this document.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed this **22** day of September, 2013.

_Stephen Drews_

Stephen Drews

**STEPHEN DREWS**
**ATTACHMENT A**

| Trade Date | Security | Number of Shares | Price Per Unit | Buy or Sell |
|---|---|---|---|---|
| 12/12/2011 | TNP Strategic Retail Trust | 10,000 | 10 | Buy |
| 02/24/2012 | TNP Strategic Retail Trust | 5,000 | 10 | Buy |